UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ASHKAN MEHDI GHAHREMANI, Derivatively on Behalf of INOVIO PHARMACEUTICALS, INC., <br><br> Plaintiff, <br><br> v. <br><br> JACQUELINE E. SHEA, PETER D. KIES, SIMON X. BENITO, ROGER D. DANSEY, ANN C. MILLER, JAY P. SHEPARD, DAVID B. WEINER, WENDY L. YARNO, and LOTA S. ZOTH, <br><br> Defendants, <br><br> -and- <br><br> INOVIO PHARMACEUTICALS, INC., a Delaware corporation, <br><br> Nominal Defendant. | No. <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> DEMAND FOR JURY TRIAL |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT**

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Violations of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

**NATURE AND SUMMARY OF THE ACTION**

1. This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Inovio Pharmaceuticals, Inc. ("Inovio" or the "Company") against certain of its officers

- 1 -

and directors for violation of section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 14a-9, breach of fiduciary duty, waste of corporate assets, unjust enrichment, and other violations of law. These wrongs resulted in tens of millions of dollars in damages to Inovio's reputation, goodwill, and standing in the business community, as well as exposing the Company to potential liability for violations of state and federal law.

2.      Inovio is a clinical-stage biotechnology company dedicated to discovering, developing, and commercializing DNA medicines to treat diseases such as human papillomavirus ("HPV"). The Company's DNA medicines consist of two components. The first are DNA plasmids—small, circular DNA molecules that function like software instructions cells can use to produce proteins to target and fight disease. The second is the proprietary investigational medical device, CELLECTRA®, which helps deliver DNA plasmids into cells via electroporation. Brief electrical pulses open small pores in the cell membrane, enabling the DNA plasmids to enter.

3.      Inovio's mission-critical DNA medicine is INO-3107, a treatment of recurrent respiratory papillomatosis ("RRP"), a respiratory disease associated with HPV. The Company currently does not sell any products and has identified INO-3107 as its lead product candidate with the greatest potential to reach the market. To commercialize INO-3107, Inovio must obtain U.S. Food and Drug Administration ("FDA") approval via a Biologics License Application ("BLA").

4.      The BLA is a standard application reviewed by the FDA for any entity seeking to introduce a biological product into interstate commerce within the United States. In the first sixty days after submission, the FDA determines whether the BLA is sufficiently complete to start a substantive review. If accepted, then under the standard process, substantive review typically takes ten months. FDA requests for additional information or clarification can extend the review timeline. Under accelerated approval, the FDA approves treatments that address an unmet medical

need for serious conditions based on a surrogate endpoint, which is a marker predicting clinical benefit.  Under priority review, the FDA shortens the substantive review period to six months, rather than ten, for applications that would significantly improve the safety or effectiveness of treatments for serious conditions.

5.      The Individual Defendants (defined *infra*) aimed to submit the BLA in the second half of 2024, seeking accelerated approval on the ground that their product candidate offered a benefit over available therapies.  They intended to request a priority review for INO-3107 under the FDA's Breakthrough Therapy designation.  Breakthrough Therapy designation applies to drugs intended to treat serious or life-threatening conditions where preliminary evidence indicates the drug may provide a substantial improvement over existing therapies on clinically significant endpoints.

6.      The Individual Defendants claimed they received FDA feedback that data from the completed Phase 1/2 clinical trial of INO-3107 for RRP could support a BLA submission for review under the accelerated approval program.  For the BLA, they were required to meet all FDA filing requirements and to conduct a confirmatory clinical trial.  They planned for that trial to evaluate clinical benefit by measuring reductions in the need for surgical intervention to control RRP in the majority of patients.

7.      They could not, however, complete the BLA submission by 2024 because of a manufacturing problem with the CELLECTRA device.  The issue involved one of the device's plastic molded components and should have been obvious, as it was identified during routine testing conducted in preparation for the BLA submission.

8.      From 2023 to 2025, the Individual Defendants made materially false and misleading statements concerning the potential for the FDA to conduct an accelerated approval or

priority review for INO-3107's BLA.  In these statements, the Individual Defendants claimed that they aimed to submit the BLA by the second half of 2024.  They failed to disclose, however, that the Company had manufacturing issues with the CELLECTRA device that they needed to resolve to complete the BLA.  They also lacked sufficient information to support the INO-3107 BLA's eligibility for FDA accelerated approval or priority review.

9.      The truth began to emerge on August 8, 2024, when Inovio issued a press release, detailing its financial results for the second quarter of 2024.  In this release, the Company revealed that submission of the INO-3107 BLA would be delayed by one year, to mid-2025, due to a manufacturing issue with the CELLECTRA device.  On this news, Inovio's stock plunged 10.45%, or $0.91 per share on August 15, 2024, to close at $7.80 per share compared to the previous closing of $8.71 per share on August 8, 2024, erasing $23.6 million in market capitalization.

10.     Despite the August 8, 2024 disclosure, the Individual Defendants continued to tout the regulatory and commercial prospects of INO-3107 in press releases and SEC filings.  For example, the materially false and misleading Proxy Statement on Schedule 14A filed with the SEC on April 7, 2025 reassured investors of INO-3017's potential to become the Company's first commercial product and claimed that the Company's Board of Directors (the "Board") was exercising its role in risk management.  It failed to disclose that the Company lacked adequate research to justify accelerated approval or priority review.  As a result of the misleading proxy statement, the Company's stockholders voted to amend and restate the Company's 2023 Omnibus Incentive Plan.  Under this plan, the total number of common stock shares available for grant increased by 2,200,000, giving the Director Defendants (defined *infra*) a material personal benefit in stock awards.

11. Then on December 29, 2025, Inovio issued a press release, announcing that the FDA had accepted the INO-3107 BLA for a standard review rather than an accelerated one. The press release revealed that the FDA indicated the Company had not provided sufficient information to qualify for accelerated approval. On this news, Inovio's stock plunged 24.45%, or $0.56 per share on December 29, 2025, to close at $1.73 per share compared to the previous trading day's closing of $2.29 per share, erasing $30 million in market capitalization.

12. Further, as a direct result of this unlawful course of conduct, Inovio is now the subject of a federal securities class action lawsuit filed in the United States District Court for the Eastern District of Pennsylvania on behalf of investors who purchased Inovio's shares (the "Securities Class Action").

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 because plaintiff's claims raise a federal question under section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), and SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated thereunder. This Court has supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

14. This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

15. Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Inovio maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the

transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Inovio, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

16.    Plaintiff Ashkan Mehdi Ghahremani was a stockholder of Inovio at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Inovio stockholder.

**Nominal Defendant**

17.    Nominal Defendant Inovio is a Delaware corporation with its principal executive offices located at 660 W. Germantown Pike, Suite 110, Plymouth Meeting, Pennsylvania.  The Company's common stock trades on the Nasdaq under the ticker symbol "INO."  As of March 11, 2026, Inovio employed approximately 112 people.

**Defendants**

18.    Defendant Jacqueline E. Shea ("Shea") has served as the Company's President, Chief Executive Officer ("CEO") and as a Company director since 2022.  Prior to that, defendant Shea served as the Company's Chief Operating Officer and Executive Vice President beginning in 2019.  Inovio paid defendant Shea the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2025 | $728,000 | $346,101 | $351,955 | $144,144 | $16,955 | $1,587,155 |
| 2024 | $728,000 | $490,819 | $475,977 | $340,704 | $15,169 | $2,050,669 |
| 2023 | $750,615 | $491,873 | $812,999 | $371,280 | $12,141 | $2,438,908 |

- 6 -

19.     Defendant Peter D. Kies ("Kies") has served as the Company's Chief Financial Officer ("CFO") since 2002.  Inovio paid defendant Kies the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2025 | $514,604 | $117,479 | $117,927 | $68,236 | $15,438 | $833,684 |
| 2024 | $506,806 | $131,957 | $127,982 | $158,123 | $15,204 | $940,072 |
| 2023 | $622,881 | $132,252 | $218,593 | $172,314 | $15,000 | $1,161,040 |

20.     Defendant Simon X. Benito ("Benito") has served as a member of the Board since 2003, and as Chair of the Board since 2019.  Defendant Benito also serves as Chair of the Nominating and Corporate Governance Committee (the "Governance Committee"), member of the Audit Committee, and member of the Compensation Committee.  Inovio paid defendant Benito the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2025 | $117,500 | - | - | $117,500 |
| 2024 | $110,625 | $23,815 | $26,026 | $160,466 |
| 2023 | $110,000 | $20,214 | $21,171 | $151,385 |

21.     Defendant Roger D. Dansey ("Dansey") has been a member of the Company's Board since 2021.  He currently serves as Chair of the Science Review & Oversight Committee and as a member of the Governance Committee.  Inovio paid defendant Dansey the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2025 | $72,095 | - | - | $72,095 |
| 2024 | $67,500 | $23,815 | $26,026 | $117,341 |
| 2023 | $67,500 | $20,214 | $21,171 | $108,885 |

22.     Defendant Ann C. Miller ("Miller") has served as a member of the Board since 2019.  Defendant Miller currently serves as a member of the Science Review & Oversight

Committee and previously served as a member of the Compensation Committee.  Inovio paid defendant Miller the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2025 | $67,500 | - | - | $24,250 | $91,750 |
| 2024 | $67,500 | $23,815 | $26,026 | - | $117,341 |
| 2023 | $75,000 | $20,214 | $21,171 | $10,750 | $127,135 |

23. Defendant Jay P. Shepard ("Shepard") has served as a member of the Board since 2020, and currently serves as a member of the Audit Committee and the Governance Committee. Inovio paid defendant Shepard the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2025 | $80,000 | - | - | $80,000 |
| 2024 | $80,000 | $23,815 | $26,026 | $129,841 |
| 2023 | $78,125 | $20,214 | $21,171 | $119,510 |

24. Defendant David B. Weiner ("Weiner") has served as a member of the Board since 2016.  He currently serves as a member of the Science Review & Oversight Committee.  He previously served as Chair of Inovio's Scientific Advisory Board, for which he received annual compensation in excess of $120,000, including equity compensation beyond the grants he receives as a Board member.  Inovio paid defendant Weiner the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2025 | $52,500 | - | - | - | $52,500 |
| 2024 | $52,500 | $23,815 | $26,026 | -$72,000 | $174,341 |
| 2023 | $52,500 | $20,214 | $21,171 | $108,108 | $201,993 |

25. Defendant Wendy L. Yarno ("Yarno") has served as a member of the Board since 2017, and currently serves as the Chair of the Compensation Committee and as a member of the Governance Committee and Science Review & Oversight Committee.  Inovio paid defendant Yarno the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2025 | $82,500 | - | - | $82,500 |
| 2024 | $82,500 | $23,815 | $26,026 | $132,341 |
| 2023 | $82,500 | $20,214 | $21,171 | $123,885 |

26.     Defendant Lota S. Zoth ("Zoth") has served as a member of the Board since 2019, and currently serves as Chair of the Audit Committee and as a member of the Compensation Committee.  Inovio paid defendant Zoth the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2025 | $77,500 | - | - | $77,500 |
| 2024 | $77,500 | $23,815 | $26,026 | $127,341 |
| 2023 | $77,500 | $20,214 | $21,171 | $118,885 |

27.     The defendants identified in ¶¶18-19 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶18, 20-26 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶20, 23, 26 are referred to herein as the "Audit Committee Defendants."  The defendants identified in ¶¶20, 22, 25, 26 are referred to herein as the "Compensation Committee Defendants."  The defendants identified in ¶¶21-22, 24-25 are referred to herein as the "Science Review & Oversight Committee Defendants."  Collectively, the defendants identified in ¶¶18-26 are referred to herein as the "Individual Defendants."

### DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

28.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Inovio and its stockholders fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage Inovio in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Inovio and not in furtherance of their personal interest or benefit.

29.     To discharge their duties, the officers and directors of Inovio were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Inovio were required to, among other things:

(a)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(b)     remain informed as to how Inovio conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

30.     Additionally, the Individual Defendants are required to adhere to the Company's Code of Business Conduct and Ethics (the "Code").  The Code states that "the Company's books, records, accounts, and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions, and must conform both to applicable legal requirements and to the Company's system of internal control."  The Code further requires the Company to "maintain disclosure controls to ensure that required information is recorded, processed, summarized, and reported as required by law and regulation and within the time periods specified…. Financial statements for external purposes will be fairly presented in conformity with generally accepted accounting principles accepted in the United States or other applicable standards as required by law or regulation."  Public statements must be "true, accurate, complete, timely, understandable, and not misleading."

**Breaches of Duties**

31.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Inovio, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

32.     The Individual Defendants breached their duty of loyalty by allowing defendants to cause, or by themselves causing, the Company to make materially false and misleading statements, engage in improper practices that wasted the Company's assets, and caused Inovio to incur substantial damage.

33.     The Individual Defendants, because of their positions of control and authority as officers and directors of Inovio, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Inovio has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

34.     In addition to these duties, under its Charter in effect since May 16, 2023, the Audit Committee Defendants, defendants Benito, Shepard, and Zoth, owed specific duties to Inovio to assist the Board in overseeing statements concerning the Company's statements concerning the likelihood of obtaining accelerated approval or priority review from the FDA for the INO-3107 BLA.  The Audit Committee's Charter requires the Audit Committee to oversee the Company's financial statements, accounting and financial reporting processes and system of internal controls.

Moreover, the Audit Committee's Charter listed additional responsibilities of the Audit Committee, stating:

***Financial Statement and Disclosure Matters***

**(a)** Meet to review and discuss with management and the independent auditors the annual audited financial statements and quarterly financial statements prior to the filing of such financial statements with the SEC, including reviewing the specific disclosures made in Management's Discussion and Analysis of Financial Condition and Results of Operations, and recommend to the Board whether the audited financial statements should be included in the Company's Annual Report on Form 10-K. Also, the Committee shall discuss the results of the quarterly reviews and approve the Company's Quarterly Reports on Form 10-Q. The Committee shall also discuss any other matters required to be communicated to the Committee by the independent registered public accountants under the standards of the Public Company Accounting Oversight Board (PCAOB) (United States).

**(b)** Discuss with management and the independent auditors any significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements and any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, any major issues as to the adequacy of the Company's internal controls and any special steps audit adopted or which need to be adopted in light of material control deficiencies.

**(c)** Effect or cause to be effected any revisions to the Company's financial statements which the Committee deems necessary or advisable after consultation with the Company's independent auditors or the Committee's advisors.

**(d)** Prior to the filing of Form 10-Q and Form 10-K, review and discuss quarterly and annual reports from the independent auditors on:

    **(i)** All critical accounting policies and practices to be used, including discussion with the independent auditors any accounting adjustments that were noted or proposed by the Auditors but were "passed" (as immaterial or otherwise).

    **(ii)** All alternative treatments of financial information within GAAP that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditors.

    **(iii)** Other material written communications between the independent auditors and management such as any management letter or schedule or unadjusted differences.

**(e)** Discuss with management the Company's earnings press releases, including the use of "pro forma" or "adjusted" non-GAAP information, as well as financial information and earnings guidance provided to analysts and rating agencies. Such

discussion may be done generally (consisting of discussing the types of information to be disclosed and the types of presentations to be made).

\*    \*    \*

**(i)** Review disclosures made to the Committee by the Company's CEO and CFO during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls. Discuss with management the related remediation plan of any significant deficiencies or material weaknesses.

\*    \*    \*

**(o)** Inquire of financial management and the independent auditors regarding the Company's significant financial risk exposures, including its anti-fraud programs and controls, and assess the steps management has taken to minimize and control such risks.

\*    \*    \*

***Compliance Oversight Responsibilities***

**(a)** Obtain from the independent auditors assurance that Section 10A(b) of the Exchange Act, which addresses the discovery and disclosure of any illegal act, has not been implicated.

**(b)** Obtain reports from management, the Company's senior internal auditing executive and the independent auditors that such persons are in compliance with applicable legal requirements and the Company's Code of Business Conduct and Ethics. Such reports shall also confirm that, to such person's knowledge, the Company and its subsidiary and affiliated entities are in conformity with applicable legal requirements and the Company's Code of Business Conduct and Ethics. Review reports and disclosures of insider and affiliated party transactions or other conflicts of interest. Advise the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations and with the Company's Code of Business Conduct and Ethics, including the consideration of a waiver in the Code of Business Conduct and Ethics.

35.    While the Audit Committee Defendants had clear responsibilities with respect to ensuring that there were controls regarding the accuracy of the Company's financial disclosures and the Company's communication with the public, the Audit Committee Defendants failed to fulfill these responsibilities.  In fact, the Audit Committee Defendants have gravely harmed the

- 13 -

Company by taking part in the publishing of false and misleading statements and omissions of material fact described herein.

**Additional Duties of the Compensation Committee Defendants**

36.    In addition to these duties, under its Charter in effect since May 16, 2023, the Compensation Committee Defendants, defendants Benito, Miller, Yarno, and Zoth, owed specific duties to Inovio to review and approve the compensation of executive officers and directors.

37.    Under the Compensation Charter, the principal duties of the Compensation Committee members include the following:

a)    Determine, or recommend to the Board, the compensation of the CEO and all other executive officers of the Company.

b)    Review and approve the Company's compensation programs and arrangements applicable to its officers (as defined in Rule 16a-1(f) of the Exchange Act), including without limitation salary, incentive compensation, equity compensation and perquisite programs, and amounts to be awarded or paid to individual officers under those programs and arrangements, or make recommendations to the Board regarding approval of the same. Without limiting the generality of the foregoing, the Committee shall review and approve all other employment-related contracts, agreements or arrangements between the Company and its officers and other senior management, as appropriate, and all other contracts, agreements or arrangements under which compensatory benefits are awarded or paid to, or earned or received by, the Company's officers and other senior management, as appropriate, including, without limitation, employment, severance, change of control and similar agreements or arrangements. In evaluating and determining executive compensation, the Committee shall consider the results of the Company's most recent stockholder advisory vote on executive compensation.

\*    \*    \*

l)    Review and approve director compensation and benefits.

m)    Review the Company's practices and policies of employee compensation as they relate to risk management and risk-taking incentives, to determine whether such compensation policies and practices are reasonably likely to have a material adverse effect on the Company.

n)    Provide recommendations to the Board on compensation-related proposals to be considered at the Company's annual meeting, including the frequency of

advisory votes on executive compensation and review and consider the results of such an advisory vote on executive compensation.

**Additional Duties of the Science Review & Oversight Committee Defendants**

38.     In addition to these duties, under its Charter in effect since May 16, 2023, the Science Review & Oversight Committee Defendants, defendants Dansey, Miller, Weiner, and Yarno, owed specific duties to Inovio to oversee the Company's research and development matters, including reviewing and advising on the reporting of data used for regulatory submissions and assessing compliance with FDA agreements.

39.     Under the Science Review & Oversight Committee Charter, the principal duties of the committee members include the following:

a)      Review, assess and oversee the Company's R&D Matters, including periodically reviewing and assessing information provided by the Company's management regarding the Company's clinical development and regulatory development goals, strategies, initiatives, programs, and activities and providing guidance with respect thereto;

b)      Review and advise the Board, management and the Company's clinical development and regulatory personnel regarding clinical development and regulatory strategy and implementation;

c)      Discuss with management the Company's ongoing relationship and formal communications with the FDA and other relevant agencies, including foreign regulators outside of the U.S.;

d)      Review, discuss and advise management with respect to the design, conduct and reporting of results and data with respect to all clinical trials, or data compilations or analyses intended to form the basis for new drug applications or other applicable marketing approvals to any governing regulatory agency, with particular focus on any agreements, protocols, understandings with or advice or recommendations with or by any reviewing regulatory agency;

e)      Discuss with management the Company's compliance with any agreements, protocols, or understandings with the FDA or other relevant agencies governing the conduct of clinical trials, tests, or other studies or analyses, and evaluate the need for remedial action and/or disclosures to address any significant or material deviations with any agreements or other understandings with the relevant agencies;

\*   \*   \*

- 15 -

2.      **Disclosures.** In conjunction with the Board and the Audit Committee of the Board, the Committee shall assist with oversight of the proper and timely disclosure by the Company of the facts and attendant risks regarding any significant or material developments, issues or problems arising out of or relating to ongoing clinical trials, tests, or other studies or analyses in public statements and filings with the U.S. Securities and Exchange Commission.

3.      **Reports.** The Committee shall report to the Board at regularly scheduled meetings of the Board. In addition, the Company's Chief Executive Officer (the "**CEO**") shall periodically report to the Board on R&D Matters. The CEO report shall contain the necessary specificity of detail regarding operational events so that the Committee and the Board may properly discharge their respective duties and responsibilities under this Charter and any other obligations that the Company has assumed.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

40.      In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

41.      During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Inovio, regarding the Individual Defendants' management of Inovio's operations and the likelihood of obtaining accelerated approval or priority review from the FDA for the INO-3107 BLA; and (ii) enhance the Individual Defendants' executive and directorial positions at Inovio and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

42.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the likelihood of obtaining accelerated approval or priority review from the FDA for the INO-3107 BLA.

43.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company to purposefully or recklessly issue materially false and misleading statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

44.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL BACKGROUND

45.     Inovio is a clinical-stage biotechnology company focused on developing and commercializing DNA medicines aimed at treating and protecting against HPV-related diseases, cancer, and infectious diseases.  Inovio aims to enhance the design and delivery of innovative DNA medicines, enabling the body to produce its own tools to combat diseases.

46.     Inovio's DNA medicines platform consists of two key components: DNA plasmids and the CELLECTRA investigational medical device.  Inovio's DNA plasmids are small circular DNA molecules that function like software, enabling the body's cells to produce specific proteins

to combat diseases.  Inovio's CELLECTRA devices use electroporation—brief electrical pulses to open pores in cell membranes and deliver DNA plasmids into cells.  The use of CELLECTRA devices avoids the need for chemical adjuvants or lipid nanoparticles and eliminates the risk of anti-vector responses associated with using viral vectors to deliver genetic material into cells.

47.     Inovio's mission-critical DNA medicine is INO-3107 to treat RRP, a disease caused by HPV-6 and HPV-11 proteins.  RRP is marked by the growth of small, wartlike papillomas in the respiratory tract.  These growths can lead to severe, life-threatening airway obstructions and respiratory issues.  RRP can also impact the patient's voice box and limit speech.  Surgery to remove papillomas is the standard treatment, but they often recur.  Inovio claims that its research indicates that reducing even one surgery is important, as each procedure carries a significant risk of permanent vocal cord damage and potential costs, affecting both quality of life and finances.

48.     Inovio currently has no products for sale and has designated INO-3107 as its lead product candidate, most likely to reach the market.  INO-3107 is an investigational DNA medicine purportedly designed to trigger an antigen-specific T cell response against HPV-6 and HPV-11 proteins.  These targeted T cells aim to eliminate infected cells, preventing or slowing new papilloma growth.  The Company claims that unlike viral vectors, INO-3107's efficacy is not affected by anti-vector immunity, allowing it to maintain T cell response and overall effectiveness, making it a significant therapeutic option for many RRP patients.  Further, INO-3107 can help reduce the need for surgery.  To commercialize INO-3107, Inovio must obtain FDA approval via a BLA submission.

49.     The BLA is a standard application reviewed by the FDA for any entity seeking to introduce a biological product into interstate commerce within the United States, typically after completion of preclinical work and clinical trials.  The BLA submission process involves a pre-

- 18 -

BLA meeting with the FDA and compiling information such as clinical data demonstrating safety and efficacy, manufacturing information, and proposed labeling. Within sixty days of submission, the FDA decides whether the BLA is complete and can proceed to substantive review. If so, the standard process for substantive review typically takes ten months. Ongoing information requests, meetings, and pre-approval manufacturing inspections can extend the review timeline. The FDA ultimately issues either an approval letter or a complete response letter identifying deficiencies. Post-approval, sponsors must meet ongoing obligations such as post-marketing studies, safety reporting, current good manufacturing practice ("cGMP") compliance, and submitting supplements for significant changes to the product, manufacturing, or labeling.

50.    Inovio claimed that it intended to seek accelerated approval or priority review for the BLA submission of its lead product candidate INO-3107. Under accelerated approval, the FDA approves drugs for serious conditions that address an unmet medical need based on a surrogate endpoint. This process allows earlier approval than would be possible if the FDA had to wait for direct evidence of clinical benefit—a therapeutic effect that is meaningful for a particular disease. A surrogate endpoint is a marker—such as a laboratory measurement, imaging result, physical sign, or other measure—that predicts clinical benefit. An intermediate clinical endpoint reflects a therapeutic effect that is reasonably likely to predict clinical benefit, such as an effect on irreversible morbidity and mortality. Whether the FDA will accept a proposed surrogate or intermediate clinical endpoint depends on the scientific evidence supporting it. Studies used to show an effect on such endpoints must be adequate and well-controlled. Using surrogate or intermediate endpoints can significantly shorten the approval timeline. However, the sponsor must conduct confirmatory trials to verify that the surrogate endpoint translates into clinical benefit. If confirmatory trials verify clinical benefit, the FDA will remove the post-approval requirement. If

they do not, the FDA may withdraw approval or revise the drug's labeled indication where the trials fail to confirm benefit or show that the benefit is smaller or shorter in duration than expected relative to the drug's risks.

51.    Inovio also sought to obtain priority review for INO-3107, based on it receiving breakthrough therapy designation by the FDA.  A breakthrough therapy is a drug intended to treat serious or life-threatening conditions, with preliminary evidence suggesting it may offer substantial improvement over existing therapies on significant clinical endpoints.  For drugs with this designation, enhanced interaction with the FDA can streamline clinical development and minimize the use of ineffective control regimens.  Breakthrough therapies are also eligible for priority review if supported by clinical data at the time of submission.  Under priority review, the FDA's goal is to act on an application within six months, compared with ten months for standard review.  The FDA reserves priority review designation for drugs that, if approved, would represent a significant improvement in the safety or effectiveness of treating, diagnosing, or preventing serious conditions.

**IMPROPER STATEMENTS**

52.    The Individual Defendants made materially false and misleading statements and omissions beginning October 10, 2023.  The statements touted the Company's ability to receive accelerated approval or priority review from the FDA for the INO-3107 BLA while omitting problems executing that strategy.  As would subsequently be revealed, however, the CELLECTRA devices had a manufacturing issue that Inovio needed to resolve to complete the BLA.  In addition, the Company lacked sufficient data to support accelerated approval or priority review for INO-3107.  When the truth emerged, Inovio's stock plunged 24.45% on December 29, 2025, erasing $30 million in market capitalization.

53.     On October 10, 2023, Inovio issued a press release, emphasizing the prospects of expedited approval and INO-3107 as a pioneering DNA medicine.  In particular, the Company stated:

> INOVIO ... has received feedback from the [FDA] that *data from its completed Phase 1/2 trial of INO-3107 for the treatment of RRP could support INOVIO's submission of a BLA for review under the FDA's accelerated approval program. The FDA also advised that the company's previously planned Phase 3 randomized, placebo-controlled trial would not be required to support this submission.* INOVIO will be required to initiate a confirmatory trial prior to BLA submission for accelerated approval and satisfy all other FDA filing requirements.... If approved, INO-3107 would be the first DNA medicine in the United States and the first INOVIO candidate to receive regulatory approval.

54.     The Company's Quarterly Report for the third quarter of 2023 on Form 10-Q filed with the SEC on November 9, 2023 (the "Q3 2023 Form 10-Q"), and the Company's Quarterly Report for the first quarter of 2024 on Form 10-Q filed with the SEC on May 13, 2024 (the "Q1 2024 Form 10-Q") also included a substantially similar statement on obtaining accelerated approval and not requiring a Phase 3 randomized, placebo-controlled trial.

55.     On November 9, 2023, Inovio filed the Q3 2023 Form 10-Q with the SEC, reporting the Company's financial and operating results for its quarterly period ended September 30, 2023. The Q3 2023 Form 10-Q downplayed risks that "may" or "could" arise when pursuing accelerated approval for the INO-3107 BLA "if" certain conditions were met.  In particular, it stated:

> *We plan to pursue accelerated approval for our product candidate INO-3107[.]*
>
> *If we pursue accelerated approval for INO-3107 for the treatment or [sic] RRP ... we would do so on the basis that there is no available therapy for that disease or condition or that our product candidate provides a benefit over available therapy.* If standard of care were to evolve or if any of our competitors were to receive full approval on the basis of a confirmatory trial for a drug or biologic for a disease or condition for which we are seeking accelerated approval before we receive accelerated approval, the disease or condition would no longer qualify as one for which there is no available therapy, and accelerated approval of our product candidate would not occur without a showing of benefit over available therapy. The treatment landscape can change quickly as the FDA converts accelerated approvals to full approvals on the basis of successful confirmatory trials.

***We have received feedback from the FDA that data from our completed Phase 1/2 clinical trial of INO-3107 for the treatment of RRP can be used to support the submission of a BLA for review under the accelerated approval program;*** however, whether any trial is sufficient to receive FDA approval under the accelerated approval pathway will depend on the safety and efficacy results of such trial and will only be determined by the FDA upon review of a submitted BLA.

\* \* \*

In addition, the FDA ***may*** terminate the accelerated approval program or change the standards under which accelerated approvals are considered and granted in response to public pressure or other concerns regarding the accelerated approval program. Changes to or termination of the accelerated approval program could prevent or limit our ability to obtain accelerated approval of any of our clinical development programs.

56.     The Q1 2024 Form 10-Q and the 2023 Annual Report on Form 10-K (the "2023 10-K") contained substantially similar warnings, which were generic provisions that did not address the risks concerning the unlikelihood of obtaining accelerated approval due to lack of adequate research and manufacturing issues with the CELLECTRA devices.

57.     On January 3, 2024, Inovio issued a press release, reiterating confidence in submitting a BLA.  In particular, it stated:

INOVIO … today announced plans to submit a BLA for INO-3107 as a potential treatment for Recurrent Respiratory Papillomatosis (RRP) in the second half of 2024. This announcement follows an Initial Comprehensive Multidisciplinary Breakthrough Therapy (Type B) Meeting with the FDA on critical aspects of the data package required to submit a BLA under the agency's accelerated approval program.

58.     Further, defendant Shea stated, "[b]ased on productive discussions with the FDA, we believe we now have established a path to submitting a BLA for INO-3107 under the accelerated approval program," and that "[o]ur plan is to complete the submission of our BLA in the second half of 2024 and request a Priority Review."

59.     These statements conveyed to investors that defendants had reached an agreement with the FDA on the requirements for accelerated approval.  They also indicated that a qualifying

- 22 -

BLA could be submitted by the second half of 2024.

60.     On March 6, 2024, Inovio issued a press release reporting its financial results for the fourth quarter and full year of 2023.  The press release quoted defendant Shea as stating that the Company has a clear path to the accelerated approval program, is on schedule for BLA submission in the second half of 2024, and anticipates a potential launch in 2025.

> In the past year we have taken our lead candidate, INO-3107 for RRP, from positive Phase 1/2 trial results to Breakthrough Therapy designation and an ***established path to BLA submission under the FDA's accelerated approval program***.... The year ahead will provide a critical opportunity to carry this positive momentum forward across our pipeline, particularly for INO-3107 as we prepare for ***BLA submission and the initiation of a confirmatory trial in the second half of 2024 and accelerate commercialization efforts for a potential 2025 launch.***

61.     The same day, Inovio filed the 2023 10-K with the SEC, reporting its financial results for the fourth quarter and full year of 2023.  The 2023 Form 10-K was signed by each of the Individual Defendants.  The 2023 Form 10-K emphasized the manufacturing quality of the CELLECTRA devices.  In particular, it stated:

> Our CELLECTRA device portfolio.… These devices have been designed to optimize delivery of our DNA medicine candidates depending on the target disease…. CELLECTRA devices are validated and manufactured under Current Good Manufacturing Practices (cGMP). We have used CELLECTRA devices in global human clinical trials.

62.     The 2023 Form 10-K also reassured investors of the ability to commercialize INO-3107:

> In 2023, we began accelerating the development of our commercialization plans for INO-3107 in the United States following notice from the FDA that the data from our completed Phase 1/2 trial in patients with RRP could be used to submit a BLA under the accelerated approval program. We believe our plasmids can be produced in commercial quantities through uniform methods of fermentation and processing that are applicable to all plasmids. We believe we will be able to obtain sufficient supplies of plasmids for all foreseeable clinical investigations.

63.     On May 13, 2024, Inovio issued a press release reporting its financial results for the first quarter of 2024.  The press release reaffirmed that Inovio was on schedule to pursue accelerated approval in the second half of 2024 and to launch in 2025.  In particular, it stated:

*INOVIO remains on target to submit its BLA seeking accelerated approval for INO-3107 in the second half of 2024.* INOVIO is preparing trial sites for recruitment based on recent feedback from the FDA that they had no additional comments on INOVIO's proposed design for the confirmatory trial. The trial is being strategically designed to focus on evaluating clinical benefit in reducing surgical intervention to control RRP disease for the majority of RRP patients. Repeat surgical interventions is the current standard of care for RRP. INOVIO's market research to date with patients and healthcare professionals indicates that a reduction of even one surgery matters, because every surgery poses a significant risk of causing permanent damage to the vocal cords.

\* \* \*

*INOVIO continues preparations to be ready to launch commercially in 2025, should INO-3107 be approved.* Efforts are focused on building the infrastructure needed to deliver the product to patients as quickly and easily as possible, from distribution and supply efforts to payer and healthcare provider support. INOVIO believes that INO-3107, if approved, has the potential to be the preferred treatment of choice for all patients with RRP, as well as healthcare professionals and payers based on results from completed clinical trials and the competitive strengths of the DNA medicine platform[.]

64.     Further, the press release quoted defendant Shea as having confidence in obtaining accelerated approval and keeping the launch timeline:

In the first quarter of 2024, we continued to deliver on our priorities for the year. *Of utmost importance, we remain on track to submit our BLA in the second half of 2024 under the accelerated approval pathway* for INO-3107 as a treatment for RRP and are working to initiate our confirmatory trial as soon as possible based on feedback from the FDA on the trial's design. We are energized by the opportunity to potentially deliver the first FDA-approved therapy for this devastating disease and continue to work expeditiously to be prepared to serve RRP patients and the physicians caring for them. If approved, INO-3107 would also be the first DNA medicine on the market in the United States, representing a major milestone for our technology platform[.]

65.     On the same day, Inovio filed the Q1 2024 Form 10-Q with the SEC, reporting the Company's financial results for its first quarter ended March 31, 2024.  The Q1 2024 Form 10-Q

reiterated confidence in pursuing accelerated approval and submitting the BLA in the second half of 2024, stating that "[w]e have received feedback from the FDA that data from our completed Phase 1/2 clinical trial of INO-3107 for the treatment of RRP can be used to support the submission of a BLA for review under the accelerated approval program[,]" and that "[a]s part of submitting our BLA under the accelerated program, which we plan to do in the second half of 2024, we will need to satisfy all FDA filing requirements and initiate a confirmatory clinical trial prior to BLA submission."

## THE FALSE AND MISLEADING PROXY STATEMENTS

66.     On April 7, 2025, the Company submitted a Proxy Statement on Schedule 14A to the SEC (the "2025 Proxy Statement").  This document requested Inovio stockholders vote on an amendment and restatement of the Company's 2023 Omnibus Incentive Plan (the "2025 Amendment of the 2023 Omnibus Incentive Plan").  The 2025 Proxy Statement informed investors that this amendment would increase the total number of common stock shares available for grant by 2,200,000 shares and extend the period for granting incentive stock options to February 27, 2035.  As of March 24, 2025, there were 24,460 shares of common stock still available for grant, meaning that if the amendment were approved, approximately 2,224,460 shares would be available for grant.  The 2025 Proxy Statement also noted that all employees, non-employee directors, and consultants, including affiliates, are eligible to participate in the amended plan.

67.     The 2025 Proxy Statement described how the Board and Audit Committee oversaw risk management.  In particular, it stated:

> The risk oversight function of our Board is carried out by both the Board and the Audit Committee. Management prepares and presents an annual business plan to the Board, which identifies risks associated with our operations and is reviewed quarterly by the Board. As provided in its charter, the Audit Committee meets periodically with management to discuss major financial and operating risk exposures and the steps, guidelines and policies taken or implemented related to

- 25 -

risk assessment and risk management. Matters of strategic risk are considered by our Board. Each quarter management reports to the Audit Committee on legal, finance, accounting and tax matters. Our Board is provided with reports on legal matters at least quarterly and on other matters related to risk oversight on an as needed basis.

68.     The 2025 Proxy Statement was misleading because it did not disclose that the Board and Audit Committee failed to fulfill their risk oversight duties, allowing Inovio to make false and misleading statements.  Additionally, it omitted that: (i) the Company lacked a valid basis for the INO-3107 BLA's FDA accelerated approval or priority review; (ii) defendants knew it was unlikely to receive such approval; (iii) INO-3107's financial prospects were overstated; (iv) the Company's financial claims were inaccurate; and (v) defendants' positive statements about the Company's business and prospects were false and lacked a reasonable basis.

## THE TRUTH BEGINS TO EMERGE

69.     The truth began to emerge on August 8, 2024, when Inovio issued a press release, detailing its Q2 2024 financial results. Defendants disclosed that Inovio anticipated submitting the INO-3107 BLA to the FDA in mid-2025—a year later than previously expected—due to a manufacturing issue with the CELLECTRA device. The press release quoted Defendant Shea as stating:

> We continue to make progress with our lead candidate, INO-3107, which has the potential to significantly improve the lives of patients with RRP. We expect all non-device related elements of our BLA package to be completed by year end and our pre-BLA meeting last week with the FDA provided us with confidence that we remain on the right track for the regulatory submission. *However, as part of the testing process required for BLA submission, we've recently identified a manufacturing issue with the single use disposable administration component of our device that we believe is resolvable, but will take additional time to rectify…. We're taking corrective steps to address the issue, and ... we now expect to be able to submit the BLA in mid-2025.*

70.     On this news, Inovio's stock plunged 10.45%, or $0.91 per share on August 15, 2024, to close at $7.80 per share compared to the previous closing of $8.71 per share on August 8,

- 26 -

2024, erasing $23.6 million in market capitalization.

71.     The same day, Inovio held a conference call with investors and analysts to discuss second quarter 2024 financial results.  During the call, Inovio's Chief Medical Officer, Michael Sumner, elaborated on the manufacturing issue with the CELLECTRA device, stating:

> [W]e have unfortunately run into a manufacturing issue with a component of our CELLECTRA device. The single-use disposable administration component, otherwise known as the array. This is used to inject the DNA medicine and administer the electroporation. The issue stems from one of the plastic molded parts within this array and was identified during routine testing to support our BLA filing.

> *    *    *

> Our device teams with the support of our external component manufacturers are working to rapidly address the issue and then repeat the required testing for the array. The additional time needed for completing this work and testing has extended our anticipated timeline for BLA submission to mid-2025.

**THE COMPANY'S FIDUCIARIES CONTINUE ISSUING IMPROPER STATEMENTS**

72.     Even after the August 8th press release, defendants continued to make false and misleading statements regarding INO-3107 BLA's prospects for FDA accelerated approval or priority review.

73.     Inovio filed several reports with the SEC that included the same boilerplate provision as referenced in Q3 2023 Form 10-Q, warning about risks that "may" or "could" arise when pursuing accelerated approval for the INO-3107 BLA "if" certain conditions were met, while at the same time minimizing those risks.  These filings included 2024 and 2025 Quarterly Reports on Form 10-Q as well as a 2024 Annual Report on Form 10-K.[1]

_____

[1] These filings included: a Quarterly Report on Form 10-Q filed August 8, 2024, reporting the Company's financial results for its second quarter ended June 30, 2024; a Quarterly Report on Form 10-Q, filed November 14, 2024, reporting the Company's financial results for its third quarter ended September 30, 2024; an Annual Report on Form 10-K, filed March 18, 2025, reporting the Company's financial results for its fourth quarter and fiscal year ended December 31, 2024 (the

74.     On November 14, 2024, Inovio released a press statement detailing its financial results for the third quarter of 2024.  The statement included a quote from defendant Shea, highlighting INO-3107's claimed ability to address an unmet medical need and/or significantly enhance the safety or effectiveness of existing RRP treatments.  This suggested to investors that the FDA was inclined to accept the INO-3107 BLA for accelerated approval or priority review.

> Our development of INO-3107 is supported by a growing body of research that collectively points to INO-3107's potential to be an important therapeutic option for all RRP patients regardless of the severity of their disease. We recently presented new immunology data highlighting the ability of INO-3107 to induce new populations of T cells that travel to the airway tissue and papilloma and correspond with clinical benefit. We've also presented our full safety and efficacy data, demonstrating that INO-3107 was shown to be well tolerated and have clinical benefit in the Phase 1/2 trial. Additionally, by the end of year, we anticipate announcing long-term clinical durability data. We continue to believe INO-3107 has the potential to become the preferred choice for the broadest number of RRP patients, healthcare providers and payors, if approved.

75.     On January 9, 2025, Inovio released a press statement highlighting expected milestones for 2025 and key achievements from 2024 ahead of upcoming investor meetings.  The statement emphasized Inovio's readiness to submit the INO-3107 BLA to the FDA with sufficient information to justify accelerated approval or priority review.  In particular, it stated:

**INO-3107**

Anticipated Milestones for 2025

- Submit BLA to the [FDA] by mid-2025 and request priority review. INO-3107 could be the preferred non-surgical therapeutic option for [RRP] and would be the first DNA medicine approved for any indication in the United States, should it be approved.

---

"2024 10-K"); a Quarterly Report on Form 10-Q, filed May 13, 2025, reporting the Company's financial results for its first quarter ended March 31, 2025; a Quarterly Report on Form 10-Q, filed August 12, 2025, reporting the Company's financial results for its second quarter ended June 30, 2025; a Quarterly Report on Form 10-Q, filed November 10, 2025, reporting the Company's financial results for its third quarter ended September 30, 2025.  The 2024 10-K was signed by each of the Individual Defendants.

- o Resolution of previously announced single-use array manufacturing issue expected by February 2025. Next steps following resolution include completion of retesting process for the CELLECTRA® device and finalization of the device sections of the Chemistry, Manufacturing and Controls (CMC) module, which will be used to update the active Investigational New Drug (IND) Application for the confirmatory trial as well as the BLA submission.

\* \* \*

- Submit a redosing study protocol to the FDA.

  - o Recently announced durability data support rationale for redosing patients with goal to maintain or improve clinical benefit.

- Present and publish recently announced durability data and immunology data, as well as the full efficacy and tolerability data from completed Phase 1/2 clinical trial, in a peer-reviewed scientific journal.

76. On February 12, 2025, Inovio released a press statement showcasing data from its Phase 1/2 clinical trial of INO-3107 for treating RRP. The data reportedly demonstrated INO-3107's potential to address an unmet medical need and/or significantly enhance the safety or effectiveness of existing RRP treatments. In particular, it stated:

> In the trial, treatment with INO-3107 induced new populations of T cells in the blood that traveled to the airway and papilloma tissue and were correlated with a reduction in the number of post-treatment surgeries. Of the 32 patients in the trial, 26 patients (81%) required fewer surgeries post-treatment when compared to the year prior to treatment. INO-3107 treatment was also well tolerated in the trial. INOVIO plans to submit its [BLA] for INO-3107 in mid-2025 and request rolling submission and priority review under the FDA's accelerated approval program. If approved, INO-3107 would be the first DNA medicine approved for any indication in the United States.

77. The press release also quoted defendant Shea as emphasizing INO-3107's claimed ability to address an unmet medical need and/or significantly enhance the safety or effectiveness of current RRP treatments. This further suggested to investors that the FDA was inclined to accept the INO-3107 BLA for accelerated approval or priority review.

> These important data characterizing the cytotoxic T cell-based mechanism of action of INO-3107, in conjunction with our recently reported durability data showing that

clinical benefit continued to improve through year two and into year three after initial treatment, with half of patients not requiring any surgeries in year two, are part of the growing body of evidence that INO-3107 has the potential to be the preferred product of choice for both patients and healthcare providers.... The primary goal for RRP patients is to reduce or eliminate the need for surgery and INO-3107 has the potential to do just that for the majority of patients. Every surgery matters and a safe and effective therapeutic alternative to surgery would be truly life-changing for RRP patients and their caregivers.

78.    On March 18, 2025, Inovio issued a press release reporting its financial results for the fourth quarter and fiscal year of 2024.  The statement quoted defendant Shea, expressing confidence that INO-3107 has the potential to become the preferred product candidate and noted that the Company is pursuing the BLA submission with urgency.

INOVIO's recent progress puts us on the cusp of achieving several long-term goals for our DNA medicines, most importantly the submission of our first BLA and potential transition to a commercial-stage company.... By resolving the previously announced device array component issue, we are back on track to submitting our first BLA for INO-3107 to the FDA. We anticipate starting our submission in mid-2025 with non-device related modules under the agency's rolling submission program, assuming it is granted, with the goal of having the complete submission accepted for priority review before the end of the year. We continue to believe that INO-3107 has the potential to be the preferred product candidate offering durable clinical benefit, tolerability and a patient-centric dosing regimen and are moving forward with urgency.

79.    On March 18, 2025, Inovio filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial results for its fourth quarter and fiscal year ended December 31, 2024. In the Commercialization section, the Company's fiduciaries expressed confidence in reaching commercialization:

In 2024, we continued to advance the development of our commercialization plans for INO-3107 in the United States based on the notification from the FDA that the data from our completed Phase 1/2 trial (RRP-001) could be used to submit a BLA under the FDA's accelerated approval program.

80.    In the Company Overview section, the Company's fiduciaries assured investors that the Company resolved a manufacturing issue and remained on track to receive priority review by the end of 2025:

We resolved the manufacturing issue in the first quarter of 2025 and are currently on track to begin a rolling submission of the BLA in mid-2025 and to request priority review, with a goal of receiving file acceptance by the FDA by the end of 2025.

81.     On May 13, 2025, Inovio released a press statement detailing its financial results for the first quarter of 2025.  This press release also included various statements highlighting INO-3107's claimed ability to address an unmet medical need and/or significantly enhance the safety or effectiveness of current RRP treatments.  It suggested to investors that the FDA was inclined to accept the INO-3107 BLA for accelerated approval or priority review.  In particular, it stated:

- Clinical and immunological results from Phase 1/2 trial of INO-3107 published in Nature Communications in February 2025

  o  INO-3107 induced new populations of T cells in the blood that traveled to airway tissue and were associated with significant clinical benefit as measured by reduced need for surgery

\* \* \*

INOVIO plans to begin rolling submission of the BLA in mid-2025 under FDA's accelerated approval program, subject to FDA concurrence, with the goal of completing the submission in the second half of 2025 and receiving FDA acceptance of the submission by the end of the year. FDA has previously awarded breakthrough therapy designation for INO-3107 and INOVIO plans to request priority review of its BLA, which if granted would allow for an FDA approval decision (PDUFA date) in mid-2026.

82.     The press release also quoted defendant Shea as expressing confidence in receiving priority review and launching INO-3107 as a preferred product:

As previously stated, our goal is to begin rolling submission in mid-2025, complete the submission in the second half of 2025 and receive file acceptance from the FDA by year end. If we receive priority review, it could allow for a PDUFA date in mid-2026.... Based on market research, we believe INO-3107 could be the preferred product for patients and providers, if approved.

83.     On August 12, 2025, Inovio released a press statement detailing its financial results for the second quarter of 2025.  The press release emphasized the Company's readiness to submit the INO-3107 BLA to the FDA with sufficient information to justify accelerated approval or

- 31 -

priority review.  In particular, it stated:

> INOVIO completed the DV [design verification] testing for the CELLECTRA 5PSP device and requested in July 2025 that the FDA allow it to begin submitting its BLA on a rolling basis based on the Breakthrough Therapy designation previously granted to INO-3107. INOVIO anticipates completing its submission over the next several months and requesting a priority review. FDA inspection of INOVIO as clinical sponsor of the Phase 1/2 trial was successfully completed. The company is working on the device-related sections for its BLA and updating its active IND [Investigational New Drug application] so it can begin enrolling patients into its placebo-controlled, randomized confirmatory trial, which will include 100 patients and be conducted at approximately 20 sites across the United States.
>
> Data from a retrospective study (RRP-002) investigating the long-term clinical efficacy of patients treated with INO-3107 have been published in a peer-reviewed journal, The Laryngoscope. The data demonstrate that INO-3107 provided significant clinical benefit to RRP patients, as measured by reduction in surgery, that continued to improve in years two and three following initial treatment.

84.     On August 26, 2025, Inovio announced in a press release that the FDA agreed with its rolling submission plan for the BLA for INO-3107.  The Company also stated that it expected to complete its submission to the FDA in the coming months and obtain priority review by the end of 2025:

> INOVIO (NASDAQ: INO), a biotechnology company focused on developing and commercializing DNA medicines to help treat and protect people from HPV-related diseases, cancer, and infectious diseases, today announced that the FDA has notified INOVIO that it agrees with its rolling submission timeline for the BLA for INO-3107 as a treatment for adults with Recurrent Respiratory Papillomatosis (RRP.) INOVIO anticipates completing its submission to the FDA in the coming months and requesting priority review, with the goal of file acceptance by the FDA by the end of 2025.

85.     The press release also quoted defendant Shea, emphasizing that based on overall data, INO-3107 could become the preferred product:

> We are pleased the FDA agreed to our rolling submission plan. We are also encouraged by their recent activity in recognizing the importance of accelerating the full approval of new technologies that can bring life-changing therapeutic options to patients suffering from rare diseases such as RRP.... Based on the totality of our data, we believe INO-3107 has the potential to become the preferred product for the treatment of RRP by patients and providers. We are leveraging our Breakthrough Therapy designation for INO-3107 to continue discussions with the

- 32 -

FDA on the pathway to approval as we aim to bring our positively differentiated therapeutic option to patients as quickly as possible.

86.     On November 3, 2025, Inovio announced in a press release that it had completed its rolling submission of the INO-3107 BLA, for accelerated approval.  In particular, it stated:

- [RRP] is a rare HPV-related disease of the respiratory tract with significant unmet need

- INO-3107 previously received Orphan Drug and Breakthrough Therapy designations; BLA submitted under FDA's Accelerated Approval program

- Expect to receive file acceptance by year end 2025 with potential PDUFA date in mid-2026 if request for priority review granted

* * *

INOVIO submitted the BLA under the FDA's Accelerated Approval program and has requested a priority review, which if granted, is expected to be completed within six months following the 60-day filing period. If approved, INO-3107 would be INOVIO's first commercial product and the first DNA medicine available in the United States.

87.     On November 10, 2025, Inovio released a press statement detailing its financial results for third quarter of 2025.  The press release reemphasized that Inovio had submitted the BLA under the FDA's accelerated approval program and requested a priority review, which, if accepted, was expected to be completed within six months.  The press release also quoted defendant Shea, touting INO-3107's ability to meet a significant need:

I'm very pleased to report that we've completed the rolling submission of our BLA for lead candidate INO-3107. We believe every patient deserves a treatment that reduces exposure to surgery and INO-3107 has the potential to meet that significant need in the RRP community. The majority of patients in our Phase 1/2 trial needed fewer surgeries after treatment and showed continued improvement through Year 2 without additional doses, and without surgical interventions during the treatment window to maintain minimal residual disease as required by other treatment modalities[.]

88.     On the same day, Inovio filed a Quarterly Report on Form 10-Q with the SEC, detailing the Company's financial results for the third quarter ending September 30, 2025.  The

report highlighted the submission of the INO-3107 BLA for priority review and emphasized the

strength of INO-3107's clinical results.  In particular, it stated:

> Utilizing our breakthrough therapy designation, we requested rolling submission of our [INO-3107] BLA in July 2025 and reported in November 2025 that we had completed the BLA submission, with the goal of receiving file acceptance by the FDA by the end of 2025. We have requested a priority review from the FDA, which, if granted, is expected to be completed within six months following the 60-day filing period.
>
> During 2025, we have presented key data regarding INO-3107 at several scientific conferences. Highlights from the data include:
>
> • 81% (26/32) of patients experienced a reduction of one or more surgeries at Year 1 post-treatment
>
> • By the end of Year 2, 91% (21/23) of evaluable patients continued to experience a reduction of one or more surgeries. Only two patients had not yet responded to treatment with INO-3107
>
> • INO-3107 demonstrated continued clinical benefit, with a persistent decline in the mean number of surgeries through Year 2 post-therapy: A 78% reduction in mean annual surgeries was seen at Year 2 compared to the 1 year pre-treatment period (0.9, n=28 vs 4.1, n=32)
>
> • Clinical response was not dependent upon low viral loads, molecular subtype or other elements of the papilloma microenvironment

## THE TRUTH FULLY EMERGES

89.     On December 29, 2025, Inovio issued a press release announcing that the FDA

accepted the INO-3107 BLA for a standard review timeline instead of an accelerated one.  The

Company indicated that the FDA found the submitted information insufficient for accelerated

approval.  Defendants also mentioned that Inovio does not intend to seek approval under the

standard timeline and plans to meet with the FDA to explore options for accelerated approval.  In

particular, the press release stated:

> [T]he [FDA] accepted the company's [BLA] for INO-3107 for review as a potential treatment for adults with RRP. ***The review classification designated by FDA is Standard.***

- 34 -

*The FDA assigned INO-3107 a Prescription Drug User Fee Act (PDUFA) review goal date of October 30, 2026, which is the date by which it intends to take action on the application.* The FDA has indicated that it is not currently planning to hold an advisory committee meeting to discuss this application.

INOVIO filed its BLA under the accelerated approval pathway. *In the file acceptance letter, the FDA noted as a potential review issue its preliminary conclusion that the company has not submitted adequate information to justify eligibility for the accelerated approval pathway.* INOVIO continues to believe that INO-3107 provides a meaningful therapeutic benefit over existing treatments and fulfills the criteria for accelerated approval. INOVIO plans to request a meeting with FDA to discuss next steps to remain eligible under the accelerated approval program. INOVIO is not currently planning to seek approval for INO-3107 under the traditional pathway.

90.     Following the press release, Inovio's stock plunged 24.45%, or $0.56 per share on December 29, 2025, to close at $1.73 per share compared to the previous trading day's closing of $2.29 per share, erasing $30 million in market capitalization.

91.     The market reacted negatively to the disclosure. On the same day, Bloomberg published an article titled "Inovio Falls as FDA Questions Drug's Accelerated Path Potential," noting that Inovio's share drop was the largest intraday decline since July 3, after the FDA questioned the accelerated approval eligibility of its experimental treatment for adults with RRP. Similarly, investor news outlets Seeking Alpha and Benzinga released articles titled "Inovio drops as respiratory papillomatosis asset denied accelerated review" and "Inovio Stock Sinks As FDA Pushes Back On Accelerated Approval For Rare Disease Drug," respectively.

92.     The following day, Jefferies commented on the disclosure, noting that Inovio's stock declined "following AA [accelerated approval] overhang in BLA acceptance with the standard review PDUFA date vs. [Inovio's] tight cash runway[,]" and that "if AA is not supportive, [the] program could be further delayed after Ph[ase ]3 results."

**REASONS THE STATEMENTS WERE IMPROPER**

93.    The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)    that the Company was experiencing known but undisclosed manufacturing issues with the CELLECTRA device;

(b)    the Company lacked sufficient data to support accelerated approval or priority review; and

(c)    as a result of the foregoing, representations concerning the likelihood of obtaining accelerated approval or priority review from the FDA for the INO-3107 BLA were improper.

**DAMAGES TO INOVIO**

94.    As a result of the Individual Defendants' improprieties, Inovio disseminated improper, public statements concerning the likelihood of obtaining accelerated approval or priority review from the FDA for the INO-3107 BLA.  These improper statements have devastated Inovio's credibility as reflected by the Company's almost $30 million, or 24.45%, market capitalization loss.

95.    Inovio's performance issues also damaged its reputation within the business community and in the capital markets.  Inovio is expected to face a "liar's discount" for the foreseeable future, a term used for stocks of companies involved in illegal activities and misleading investors.  As such, Inovio's ability to raise equity capital or debt on favorable terms in the future is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual

Defendants have materially increased the perceived risks of investing in and lending money to the Company.

96.    Further, as a direct and proximate result of the Individual Defendants' actions, Inovio has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws; and

(b)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to Inovio.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

97.    Plaintiff brings this action derivatively in the right and for the benefit of Inovio to redress injuries suffered, and to be suffered, by Inovio as a direct result of violations of securities law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Inovio is named as a nominal defendant solely in a derivative capacity.

98.    Plaintiff will adequately and fairly represent the interests of Inovio in enforcing and prosecuting its rights.

99.    Plaintiff was a stockholder of Inovio at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Inovio stockholder.

100.    The current Board of Inovio consists of the following eight individuals: defendants Benito, Dansey, Miller, Shea, Shepard, Weiner, Yarno, and Zoth.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Each Director Defendant Faces a Substantial Likelihood of Liability**

101.    As alleged above, each of the Director Defendants breached their fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings regarding Inovio's business, operations, prospects, internal controls, and financial statements. Moreover, each Director Defendant signed the 2023 and 2024 Forms 10-K.

102.    Director Defendants caused the 2025 Proxy Statement to propose a stockholder vote on the 2025 Amendment of the 2023 Omnibus Incentive Plan, increasing the shares available for issuance by 2,200,000.  The false and misleading statements concerning INO-3107's potential to become the Company's first commercial product were material for stockholders voting on the amendment.  Before the amendment was approved at the annual meeting on May 20, 2025, 24,460 shares were available under the plan.  Thus, the Director Defendants gained significant personal benefits that they would not have received without the issuance of the 2025 Proxy Statement and the approval of the amendment.  Therefore, the Director Defendants face a substantial likelihood of liability, rendering demand futile as to them.

103.    Defendants Benito, Shepard, and Zoth, as Audit Committee members, reviewed and approved improper statements and earnings guidance, violating their Audit Committee Charter duties to oversee the Company's financial reporting and internal controls.  They failed in risk management and ensuring Board oversight, breaching their fiduciary duties . The Audit Committee's Charter mandates compliance with accounting, legal, and regulatory requirements, which they neglected by allowing improper statements and press releases.  Their actions, done knowingly or recklessly, breached their duty of loyalty, creating a substantial likelihood of liability and rendering any demand upon them futile.

- 38 -

104.    Any suit by the current directors of Inovio to remedy these wrongs would expose defendants Shea, Kies, and Inovio to liability for violations of the federal securities laws in the pending consolidated Securities Class Action, and would result in civil actions being filed against one or more of the other Individual Defendants.  The Securities Class Action alleges violations of Sections 10(b) of the Exchange Act and Rule 10b-5.  If the Board elects for the Company to press forward with its right of action against defendants Shea and Kies in this action, then Inovio's efforts would compromise its defense of the Securities Class Action.  Accordingly, demand on the Board is excused.

105.    The principal professional occupation of defendant Shea is her employment with Inovio, pursuant to which she has received and continues to receive substantial monetary compensation and other benefits as alleged above.  Accordingly, defendant Shea lacks independence from Benito, Dansey, Miller, Shepard, Kies, Weiner, Yarno, and Zoth due to her interest in maintaining her executive position at Inovio.  This lack of independence renders defendant Shea incapable of impartially considering a demand to commence and vigorously prosecute this action.  Inovio paid defendant Shea a total compensation of $2,438,908 in 2023, $2,050,669 in 2024, and $1,587,155 in 2025.

106.    Accordingly, defendant Shea is incapable of impartially considering a demand to commence and vigorously prosecute this action because she has an interest in maintaining her principal occupation and the substantial compensation she receives in connection with that occupation.  Demand is futile as to defendant Shea.

## COUNT I

**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9**

107.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

108.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to [section 12] of this title [15 U.S.C. § 78l]."

109.    Rule 14a-9, promulgated pursuant to section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

110.    The 2025 Proxy Statement violated section 14(a) and Rule 14a-9 because it solicited stockholder votes for, among other things, approval of the 2025 Amendment of the 2023 Omnibus Incentive Plan, while claiming that the Board was exercising its role in risk management.

111.    The 2025 Proxy Statement did not disclose that: (i) the Company did not have sufficient research to support the INO-3107 BLA's qualification for FDA accelerated approval or priority review; (ii) defendants were aware that the INO-3107 BLA was unlikely to obtain accelerated approval or priority review; (iii) the financial outlook for INO-3107 was overstated;

(iv) the Company's financial claims were inaccurate; and (v) due to these factors, defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis at all relevant times.

112.   These misrepresentations and omissions were material to plaintiff when voting on the matters presented for stockholder decision in the 2025 Proxy Statement.

113.   Inovio was damaged because of the Individual Defendants' material misrepresentations and omissions in the 2025 Proxy Statement.

114.   Plaintiff, on behalf of Inovio, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

115.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

116.   The Individual Defendants owed and owe Inovio fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Inovio the highest obligation of care and loyalty.

117.   The Individual Defendants and each of them, violated and breached their fiduciary duties.

118.   The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) manufacturing issues with the CELLECTRA device; and (ii) the Company lacked adequate information to obtain accelerated approval or priority review for INO-3107's BLA.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

119.    The Director Defendants, as directors of the Company, owed Inovio the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly permitting the improper activity concerning false and misleading statements.  The Director Defendants knew or were reckless in not knowing: (i) manufacturing issues with the CELLECTRA device; and (ii) the Company lacked adequate information to obtain accelerated approval or priority review for INO-3107's BLA.  Accordingly, these defendants breached their duty of loyalty to the Company.

120.    The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

121.    The Compensation Committee Defendants breached their fiduciary duty of loyalty by approving executive and director compensation, which they knew or were reckless in not knowing was unjust, as it was tied to false and misleading statements and the Company's artificially inflated valuation.

122.    The Science Review & Oversight Committee Defendants breached their fiduciary duty of loyalty by allowing the Company to issue false and misleading statements pertaining to the likelihood of obtaining accelerated approval or priority review of INO-3107's BLA, which they knew or were reckless in not knowing were unsubstantiated due to lack of adequate research and manufacturing issues with the CELLECTRA devices.

123.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Inovio has sustained significant damages, as alleged herein.  As a result of

the misconduct alleged herein, these defendants are liable to the Company.

124.    Plaintiff, on behalf of Inovio, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Waste of Corporate Assets

125.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

126.    As a result of the Company's inadequate controls and materially false and misleading statements concerning the likelihood of obtaining accelerated approval or priority review from the FDA for the INO-3107 BLA, the Individual Defendants have caused Inovio to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

127.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

128.    Plaintiff, on behalf of Inovio, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

129.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

130.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Inovio.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Inovio.  The Individual Defendants received bonuses, stock options, and other Inovio compensation tied to the false and misleading statements and the Company's

artificially inflated valuation.

131.   Plaintiff, as a stockholder and representative of Inovio, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

132.   Plaintiff, on behalf of Inovio, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Inovio, demands judgment as follows:

A.   Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' violations of securities law, breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.   Directing Inovio to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Inovio and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.   a proposal to strengthen the Company's controls over financial reporting;

2.   a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.   a provision to permit the stockholders of Inovio to nominate at least three candidates for election to the Board; and

4.      a proposal to strengthen Inovio's oversight of its disclosure procedures;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Inovio has an effective remedy;

D.      Awarding to Inovio restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  May 27, 2026

**THE ROSEN LAW FIRM, P.A.**

*/s/ Olivia D. Simkins*
OLIVIA D. SIMKINS (PA Bar No. 336339)
101 Greenwood Avenue, Suite 520
Jenkintown, PA 19046
Telephone: (215) 600-2817
Email: osimkins@rosenlegal.com

**ROBBINS LLP**
BRIAN J. ROBBINS
STEPHEN J. ODDO
MICHELLE H. NGUYEN
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail:  brobbins@robbinsllp.com
        soddo@robbinsllp.com
        mnguyen@robbinsllp.com

Attorneys for Plaintiff

1727666

- 45 -

## VERIFICATION

I, Ashkan Mehdi Ghahremani, hereby declare as follows:

I am the plaintiff in this action. I have read the verified stockholder derivative complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated:_____5/25/2026_____

_____
ASHKAN MEHDI GHAHREMANI